**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

SANDRA HAYWARD,

       Plaintiff,                     CASE NO. 07-CV-10622

v.                                DISTRICT JUDGE THOMAS LUDINGTON
                                MAGISTRATE JUDGE CHARLES BINDER

GMAC MORTGAGE, LLC,
GMAC GLOBAL RELOCATION
SERVICES, LLC, AND
KARL THUGE,

       Defendants.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Dkt. 47)

**I.    RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' motion be

**GRANTED** and the case be dismissed with prejudice.

**II.   REPORT**

    **A.    Introduction**

By order of United States District Judge Thomas Ludington, this employment case alleging

age and weight discrimination and retaliation brought under the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C.§ 621, *et seq.*, and Michigan's Elliot-Larsen Civil Rights

Act ("ELCRA"), MICH. COMP. LAWS § 37.2201 *et seq.*, was referred to the undersigned magistrate

judge for general case management on February 13, 2007.  (Dkt. 3.)  On September 2, 2008,

Defendants filed the instant motion for summary judgment. (Dkt. 47.) Plaintiff responded (Dkt. 51), and Defendants replied. (Dkt. 54.) Oral argument was held on October 14, 2008. Therefore, the motion is ready for Report and Recommendation.

## B. Background Facts

In 2002, Plaintiff was hired by Defendant General Motors Acceptance Corporation Mortgage ("GMACM"). She was 56 years old at that time. GMACM provided mortgage services to clients wishing to assist their employees who were being transferred to new locations. Plaintiff was hired as a Client Relations Manager ("CRM") under the direct supervision of John Rasmussen. (Def.'s Mot., Dkt. 47 at 9; Pl.'s Resp., Dkt. 51 at 8.) Plaintiff stated in her deposition that she is five feet and three inches tall and that she weighed approximately 194 pounds when she worked at GMACM as a CRM. (Pl.'s Dep., Dkt. 51, Ex. 2 at 29.)

John Rasmussen, senior vice president at GMACM,[1] clarified that CRMs are the "main point of contact for existing clients," they "answer and respond to client questions," meet the "day-to-day needs of the clients," "bring[] them trends and ideas that were happening in the mortgage industry that might help them with their relocation program," and they "report[] back on the performance of our services." (Rasmussen Dep., Dkt. 51, Ex. 5 at 5; Dkt. 47 at 9-10; Dkt. 51 at 8.)

When asked whether there were specific geographic territories assigned to CRMs in 2002, Mr. Rasmussen responded that GMACM "tried to group them together as much as we can . . . and it wasn't always that cleanly lined up . . . [and] the [CRMs] did travel, especially to bigger clients [s]o, if you could get all your Denver clients, you know, signed to the same [CRM] . . . that made it more efficient." (Rasmussen Dep. at 7; Dkt. 51 at 8.) Plaintiff was responsible primarily for

---

[1] As a senior vice president, Mr. Rasmussen reported to Bill Berkelbach. (Rasmussen Dep. at 4.)

West Coast clients and some accounts in Texas (e.g., Halliburton). Michael Nasr was assigned to the Midwest and West Coast, Caron Eisengruber was assigned to the Northeast, Susan Maylone was assigned to General Motors in Detroit, Michigan, and Michael Bailey was assigned to the Northeastern portion of the United States. (Dkt. 47 at 10; Dkt. 51 at 8; Pl.'s Dep. at 10.)

Mr. Rasmussen stated that Plaintiff was a "good employee" and was "very good with contract review and those discussions with clients, she had good technical skills and good industry knowledge," she "conduct[ed] herself as a professional" and he did not recall any complaints from her clients nor did he ever have any problems with Plaintiff. (Rasmussen Dep. at 9-10.)

In August 2004, because Defendant GMACM was growing in its client base, an additional managerial position was created. Defendant Karl Thuge ("Thuge") assumed the position of Vice President of Client Relations and Business Development and he became responsible for supervision of the CRMs, including Plaintiff, Susan Maylone[2] (age 56), Caron Eisengruber (age 36), Michael Bailey (age 44) and eventually Michael Nasr (age 37).[3] (Dkt. 47 at 10; Dkt. 51 at 9.) Defendant Thuge worked for GMACM until March 1, 2007, and he reported to John Rasmussen until he assumed Mr. Rasmussen's position at which time he began reporting to Bill Berkelbach. (Thuge Dep., Dkt. 51, Ex. 4 at 3, 8, 10-11.)

In August through September of 2004, client assignments were realigned by Defendant Thuge and possibly with the aid of Mr. Rasmussen. (Dkt. 47 at 10; Dkt. 51 at 9.) As a result of the realignment, Plaintiff was assigned the South, Michael Bailey the Northeast, Caron Eisengruber the West, and Sue Maylone General Motors in Detroit. (Dkt. 51 at 9; Pl.'s Dep. at 10.) Michael Bailey and Sue Maylone were largely unaffected. Caron Eisengruber's client base

---

[2] At times in the submitted documents her last name is spelled "Malone." *E.g.*, Dkt. 51 at 9.

[3] Ages are approximate and are important only in showing the relative ages of employees.

changed from the Northeast to the West and Plaintiff's changed from the West with some Southern clients to the South alone. Plaintiff stated that she, Ms. Eisengruber, and Mr. Nasr were all unhappy with the changes. (Pl.'s Dep. at 10; Hertel Dep., Dkt. 51, Ex. 6 at 19.) After the realignment, Plaintiff was no longer assigned to some former significant clients in the West such as Northrop Grumman, American Honda, and the Gap. (Dkt. 51 at 9.) Defendant pointed out in oral argument that, although Plaintiff refers to certain clients as being "hers," all of the entities are actually clients of the Defendant corporation and not of any one CRM.

Defendant contends that this realignment was done to "cut travel costs, increase CRM knowledge and involvement in their assigned territories, and increase client service." (Dkt. 47 at 10.) Plaintiff contends that the reason for realignment was to "match personalities" of the CRMs with the various clients and further contends that "personality" was a code word for "age." (Dkt. 51 at 9.) Plaintiff further complains that although she worked hard to obtain Microsoft as a customer, Defendant Thuge removed her from the account "because the contact at Microsoft was significantly younger than she and therefore Caron Eisengruber (36) was asked to service it." (Dkt. 51 at 9.) On the other hand, Defendant states that because one of Plaintiff's larger clients was Halliburton, whose headquarters was located in Texas, Plaintiff was assigned the South. (Dkt. 47 at 10.) Plaintiff concedes that Halliburton was a desirable account that she wanted to retain. (Dkt. 47, Pl. Dep., Ex. 27 at 6-7.)

The reorganization and realignment also affected the directors of national accounts ("DNA"s), e.g., Heather Goss, Chris Chalk and Matt Canfield. (Dkt. 51, Ex. 6 at 16-17.) DNAs "were the executives that would go out and call and bring new business on board, a new client on board [and the CRMs'] main responsibility was to maintain that relationship." (Dkt. 51, Hertel Dep., Ex. 6 at 17.)

Defendant Thuge and Plaintiff agree that Defendant Thuge's stated reason for assigning Plaintiff the South was because "her personality fit the south versus the west coast." (Dkt. 51, Thuge Dep., Ex. 5 at 11.)  Michael Bailey, CRM and eventually supervisory CRM, stated that the realignment was done because "[t]hey wanted to make sure that — 'they' being Karl Thuge and John Rasmussen, wanted the personalities to fit the account client representation – representatives."  (Dkt. 51, Ex. 7 at 6.)  He explained that "a lot of clients in New York and New Jersey really like to have answers immediately.  They don't want to mess around with small talk . . . [t]hey're strictly bottom line type people . . . ."  (Dkt. 51, Ex. 7 at 6.)  He added that because he fit that "type," he was able to work with East Coast clients and he added that this attribute may also have helped him get along with Defendant Thuge.  (Dkt. 51, Ex. 7 at 6-7.)

When Plaintiff was asked whether Defendant Thuge explained what he meant by her personality fitting the South, Plaintiff responded, "Just that I had a good relationship with my clients in the south, which I did, but I had a good relationship with all of my clients." (Pl.'s Dep. at 11.)  Similarly, when Plaintiff was asked, "Do you understand that comment about you were being assigned the south because your personality fit the south had some kind of reference or connection to your age?" Plaintiff responded," I was very confused by it, so I will not say yes or no, I was offended by it."  Plaintiff was further asked, "Why were you offended?" Plaintiff responded, "Not knowing what he meant by my personality and not knowing why my personality did not meet the criteria to work on the west coast and what about my personality made me suitable for the south versus a different  territory."  (*Id*. at 11-12.)  Plaintiff stated that she does not remember Defendant Thuge providing any clarification about what he meant by "personality" but Plaintiff gleaned from his "actions, that [her] appearance and [her] age did not fit with the age group of the clients on the west coast." (*Id*. at 12.)  When further asked what actions led her to this

conclusion, she responded, "Just a generalization of incorporating younger people into the account and removing me from the account, people that had not been on the account but were being transitioned into it without any real knowledge of the account because they were given that territory. They were younger, and I was being moved out of that area and into a different generation of clients to work with." (*Id*. at 12.) Plaintiff conceded that only "some" of the west coast clients were younger than the clients in the south. (*Id*.) Ms. Eisengruber, who was given the west coast area, was younger than Plaintiff. (*Id*.)

Plaintiff complains that her "client base was being diminished . . . [that she was] having the same clients but fewer of them" and that her "responsibility and [her] workload diminished to the point of being noticeable." (*Id*.) Plaintiff further complained that during this realignment period, Defendant Thuge "would contact [her] clients personally, without letting [her] know . . . and [her] clients . . . would call her and want to know why he was calling them . . . and it was an embarrassment . . . ." (*Id*.) When asked to explain her dissatisfaction with the realignment of clients, Plaintiff stated:

> I was trying to understand what the big picture was, which was not being made clear to me, and we had been working very hard to maintain those clients and to develop them, and them to have not understood why they were being changed or taken away made it very difficult to understand what was happening. And to be told that you have a good relationship with this client, but you are being taken away from that client after you have worked for four years to develop that relationship, there was – as I said previously, there was a lot of chaos and confusion, so the choice of saying yes, I want this territory versus that territory, I did not have that choice, and I did not say I would prefer this territory to that territory. That was not an option for me to say, and it was so confusing because you would be given a territory in this new transition, then someone would leave, and then the next thing you would know is you were being – said okay, now you are going to take that one back because there's nobody else to work it. So there was no set decision going on. It was a very confusing time, and everyone was just reacting to what job had to be done, so you did the job you had to do and took care of the clients that were – needed to be serviced.

(*Id*. at 13-14.)  After this explanation, Plaintiff was asked how the client realignment appeared related to her age and Plaintiff responded it was "[t]he fact that I was not suited to the west coast." (*Id*. at 14.)  Plaintiff later agreed that she was not told she was not suited for the west coast; rather, she was "told [her] personality fits the south."  (*Id*.)  Plaintiff surmised that Defendant "Thuge felt that [she] would do better with developing relationships with people that were more [her] age" and that, although Defendant Thuge never said anything about age, Defendant Thuge "led [her] to believe that" by "his actions."  (*Id*.)  Plaintiff explained that the "actions" were that Defendant Thuge "took [her] away from developing relationships with people that were younger than I was, especially Microsoft."  (*Id*.)  Plaintiff's particular grievance with the handling of the Microsoft account was described by Plaintiff as follows:

> When we won the Microsoft account, I was immediately taken away from a relationship with the Microsoft contact, Peggy Smith, who was considerably younger than I am, and that was when we were at a conference, and I was immediately separated from her and Caron Eisengruber was introduced to her, and it was very confusing to Peggy as to why, all of a sudden, she was being introduced to someone else into that relationship and I was being shoveled off to the side and told to go talk to another client who was more my age, Mickey Leong with Northrup Grumman.

(*Id*.)  Plaintiff later acknowledged that the Microsoft decision was made after the territory realignment was announced.  (*Id*. at 15.)  Plaintiff recognized that introducing Ms. Eisengruber to the Microsoft contact person was part of the plan to make clients comfortable with the transition from one CRM to another.  (*Id*.)  Plaintiff also clarified that Defendant Thuge did not tell her to speak with people her own age but that she interpreted the situation in that manner because Defendant Thuge asked her to stop speaking with the Microsoft contact and to begin speaking with another contact.  (*Id*.)

Plaintiff believes that she should have been promoted to the CRM team lead position rather than Michael Bailey.  (*Id*. at 25.)  Plaintiff states that she and Mr. Bailey were "equal candidates,"

i.e., were equally qualified for the position.  (*Id*.)  Plaintiff contends that she was told that she was not promoted because Mr. Bailey got along with Defendant Thuge better than she did.  Plaintiff also thought she was not promoted because of her age and weight since Mr. Bailey is younger than Plaintiff and is of "average, normal weight." (*Id*.)  Plaintiff was also unhappy when, after Mr. Bailey was promoted to manage the CRMs, she and the other CRMs were not invited to attend management meetings and "no longer had any information about what was happening or had any input into the meeting." (*Id*. at 18.)  Although Plaintiff was disappointed in the decision promoting Mr. Bailey to the supervisory position, Plaintiff thought Mr. Bailey treated her fairly.  (*Id*. at 27.)

Plaintiff also applied for a promotion to telesales manager in July 2005 but that position was given to Nina Arnez, who was in "her 20s." (*Id*. at 26-27.)  Although Plaintiff considered herself qualified for that position, Bob Sparrow, who interviewed her and made the decision, did not. (*Id*. at 27; Ex. 6 at 22-23.)

Plaintiff filed a complaint with Human Resources regarding Defendant Thuge's comment to Plaintiff while walking in an airport during a business trip to Halliburton in Texas that "if you were a horse, they would shoot you." (*Id*. at 29-30.)  Plaintiff believes this statement is related to both her age and weight because, as she stated, "I was moving slowly and not as spry and cannot get through an airport as quickly as a younger, less overweight person can." (*Id*. at 30.)

Lori Wertman, human resources consultant for Defendant GMACM, investigated Plaintiff's complaint about Defendant Thuge. (Wertman Dep., Dkt. 51, Ex. 12 at 4.)  Defendant Thuge did not deny or confirm that he made the "horse" comment when speaking with Ms. Wertman.  (Dkt. 51, Ex. 12 at 9.)  Plaintiff concedes that human resources did investigate the complaint she filed but she felt the investigation was inadequate.  (Dkt. 51, Ex. 2 at 36, 38.)

Defendant Thuge told Ms. Wertman that he did try to match personalities of the CRMs to appropriate territories because "the northeast clients communicate quickly or sharp and to the point, and some customer relationship managers do not enjoy working with the northeast due to that fact [a]nd he stated that southern territory is not as abrasive or direct." (Dkt. 51, Ex. 12 at 9-10.) Defendant Thuge also stated that Plaintiff was given the Southern territory because her "biggest client was in Texas . . . ." (*Id*. at 10.)

Plaintiff also complains that she was upset at being "watched" and that Mr. Bailey made an offer to Plaintiff for her to be paid a "premium" to work a late shift, i.e., from 11 a.m. to 7 p.m., rather than the 8:30 a.m. to 8:30 p.m. hours Plaintiff was working. Plaintiff conceded that this offer was for more money to work less hours, she "accepted" that offer, but she continued to come in at 8:30 a.m. and work until 8:30 p.m. (Dkt. 51, Ex. 2 at 33.) On the other hand, Plaintiff also complained that she was "very bored because [she] didn't have any responsibilities, to speak of . . . ." (*Id*. at 34.) Plaintiff believes that her "client caseload went from 70 to 20."

In August 2005, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Dkt. 51 at 26.)

In January 2006, Plaintiff, then 61 years old, resigned from GMACM and accepted a position with GMAC Global Relocation Services ("GRS"). This division of GMAC provided "turnkey" services for the relocation of a client's transferred employees. Plaintiff's new position was a lateral move, but was described in oral argument as a higher-level position, because it was a consulting role involving analyzing relocation policies and bench-marking. Plaintiff contends that her new employment was tainted by conversations between Defendant Thuge and her supervisor at GMAC GRS, Jill Taylor. Plaintiff asserts that Ms. Taylor told her that Defendant Thuge stated that Plaintiff was known for having difficulty with management and that Plaintiff was

known for office gossip. (Dkt. 51, Ex. 2 at 41-42.) These two comments are the only comments that Plaintiff attributes to conversations between Defendant Thuge and Ms. Taylor. (*Id*. at 42.)

At a meeting on January 16, 2006, Ms. Taylor told Plaintiff that her skill level with respect to Microsoft Word, Excel, and Powerpoint was not meeting the expectations of her position and that Plaintiff needed to pay more attention to details. (*Id*. at 42-43.) Plaintiff felt as if she "could never meet [Ms. Taylor's] expectations." (*Id*. at 42.) Plaintiff met with Ms. Taylor and Julie DeCero to discuss how her performance could be improved and Plaintiff was placed on a performance plan. Thereafter, Plaintiff's draft of an article was unsatisfactory to Ms. Taylor, so Ms. Taylor assigned another person to complete the task. (*Id*. at 44.) On May 3, 2006, Plaintiff's employment with GMAC GRS was terminated.

After receiving a "right to sue" letter from the EEOC, the instant suit was filed. Plaintiff's allegations in the Second Amended Complaint are as follows: (I) violation of the Age Discrimination in Employment Act, including hostile work environment based on age; (II) violation of the Michigan Elliot-Larsen Civil Rights Act based on age, including hostile work environment based on age; (III) violation of ELCRA based on weight, including hostile work environment based on weight; (IV) unlawful retaliation for engaging in protected activity under the ADEA; (V) unlawful retaliation for engaging in protected activity under ELCRA; and (VI) defamation. (Dkt. 14.)

Plaintiff's retaliation claim against GMACM is based on the fact that she felt shunned by the management team (Defendant Thuge and Mr. Bailey), that her clients were immediately transitioned away from her, and that she feared for her job constantly. (Pl.'s Dep., Dkt. 51, Ex. 2 at 40.) Her retaliation claim against GMAC GRS is based on the alleged statements made by

Defendant Thuge to her supervisor at GMAC GRS that Plaintiff had difficulties with management and that she was involved in office gossip. (Dkt. 51 at 25-26.)

Plaintiff's weight discrimination claim is based on Defendant Thuge's comment, "do you really need that?," when Plaintiff approached a co-worker's candy jar, comments that it was important to exercise and watch what you eat, and comments that something she was wearing didn't match, all of which led Plaintiff to be "self-conscious around him about [her] appearance." (*Id*. at 21.) Plaintiff clarified that her claims are based solely on the actions of Defendant Thuge; she does not contend that any other person treated her differently based on her age or weight. (*Id*. at 21.)

Plaintiff summarizes: "my feeling was that I was being put in a place because of my age and moved into an area that had a more age reflective or age appropriate people with looking at the Halliburton people versus the younger people at The Gap, at Microsoft, and because of my age, I was being transitioned out of that area, in my personal opinion." (*Id*. at 16.) Plaintiff based her feeling that the reassignments were because of her age on the sole fact that Ms. Eisengruber, who was younger than she was, was assigned the west coast. (*Id*.) Plaintiff acknowledges that the realignment did not affect her salary, i.e., her salary stayed the same. (*Id*. at 17.) Plaintiff further acknowledged that by September 2005, "Microsoft was back and it was my client again" and Microsoft was the only west coast client that had formerly been managed by Plaintiff that was reassigned to another CRM during the realignment. (*Id*. at 19.)

## C. Applicable Standard of Review and Governing Law

## 1. Rule 56(c) Motion for Summary Judgment

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406. "Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519

F.3d 587 (6th Cir. 2008) (granting summary judgment where plaintiff supported each allegation of racial animus only with citation to his own testimony stating his opinion that he was the victim of racial harassment).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### 2. *McDonnell Douglas / Burdine*

When a Plaintiff lacks direct evidence[4] of discrimination and presents circumstantial evidence, courts examine ADEA, ELCRA, and retaliation claims under the *McDonnell Douglas/Burdine* burden-shifting scheme. *Imwalle v. Reliance Medical Products*, 515 F.3d 531, 544 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (retaliation claim); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (ADEA). Since "Title VII's anti-retaliation provision is similar in relevant aspects to the ADEA's anti-retaliation provision, [] it is therefore appropriate to look to cases construing

---

[4]Neither party alleges that direct evidence exists in the instant case. Even if they had, "general, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Daugherty v. Sajar Plastics, Inc.*, ___ F.3d. ___, No. 06-4608, 2008 WL4587204, at *11 (6th Cir. 2008). In addition, "age-based slurs may well betray a bias that older workers are less valuable or competent, [h]owever, such statements will not constitute direct evidence [where] the plaintiffs do not allege that they were made in relation to the decision to discharge the plaintiffs . . . ," *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 550 (6th Cir. 2004), *but see Blair v. Henry Filters, Inc.,* 505 F.3d 517, 525-27 (6th Cir. 2007) (discussing tension between *Rowan* and earlier Sixth Circuit cases and concluding the court "need not resolve this conundrum here").

Title VII as a source of authority for interpreting the ADEA's anti-retaliation clause." *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007). In addition, "claims under both the ADEA and ELCRA" may be "address[ed] together" because the same standards and mode of analysis apply to claims arising under both statutes." *Blair v. Henry Filters, Inc.,* 505 F.3d 517, 523 (6th Cir. 2007). Plaintiff bears the initial burden of production to show a prima facie case of discrimination. *Michael v. Caterpillar Financial Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007).

If a plaintiff meets this initial burden, this "creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged [] action." *Carter v. University of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). If the defendant articulates a legitimate, nondiscriminatory reason, the burden of production shifts back to the plaintiff to "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

The salient issue in a claim of discrimination is whether the plaintiff was singled out because of her membership in a protected class and treated less favorably than those outside the class, not whether the plaintiff was treated less favorably than "someone's general standard of equitable treatment." *Batts v. NLT Corp*., 844 F.2d 331, 337 (6th Cir. 1988) (citations omitted).

### D. Discrimination Claims

### 1. Claim Stemming from Realignment of Geographical Territories

### a. Prima Facie Case

The elements of a prima facie case under the ADEA and ELCRA are: (1) plaintiff is a member of a protected class, i.e., over forty years old for age discrimination claims, (2) she was subject to an adverse employment action, (3) she was qualified for the position at issue, and (4) she was replaced by someone outside of the protected class or a similarly-situated person outside

of the protected class was treated more favorably. *Wright v. Murray Guard, Inc.* 455 F.3d 702, 707 (6th Cir. 2006); *Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 728 (6th Cir. 2004).

Here, it is undisputed that Plaintiff is a member of a protected class based on age under the ADEA and ELCRA and based on weight under ELCRA alone. It is also undisputed that the person receiving the alleged employment benefit, i.e., west coast accounts (Ms. Eisengruber), was younger and of normal weight. It is also undisputed that Plaintiff was qualified to continue in her position with GMACM, although she chose to voluntarily leave that position for one with Defendant GMAC GRS. However, the adverse employment action element is disputed. *Wright,* 455 F.3d at 707. Plaintiff relies on the realignment of territories as an instance of adverse action.[5]

Adverse employment action is "defined as a 'materially adverse change in the terms and conditions of [plaintiff's] employment.'" *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004) (finding that 24-hour suspension of firefighter from work, which was equivalent to three eight-hour days, was sufficiently adverse to state a claim even where the plaintiff's suspension was ultimately reversed). Such action usually "inflicts direct economic harm." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). A *"de minimis"* employment action is "not materially adverse and thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). "In other words, a 'bruised ego' caused by trivial employment actions is not sufficient." *Freeman v. Potter*, 200 Fed. App'x 439, 442 (6th Cir. 2006) (holding that the defendant's refusal-to-transfer was not a materially adverse action because it did

---

[5]As defense counsel pointed out in oral argument, the standard to show constructive discharge is a difficult one to meet. "For a transfer or reassignment to amount to a constructive discharge, the conditions must be objectively intolerable to a reasonable person." *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002). However, as indicated above, adverse action is not limited to "ultimate employment decisions" such as termination and Plaintiff has not described her claim as one for constructive discharge; therefore, I will analyze the claim as one asserting adverse employment action less than termination rather than constructive discharge.

not significantly alter his career opportunities despite plaintiff's claim that transferee office was more prestigious). "[A]n employee need not have suffered one of the 'ultimate employment actions' listed above (e.g., termination, demotion, failure to promote, etc.) to have a viable claim of discrimination; [a] material adverse action may consist of a less distinguished title, diminished option for advancement, or other unique indices . . . however, an individual's 'subjective impression concerning the desirability of one position over another' is insufficient to render an employer's action materially adverse." *Id.* (citations omitted).

"[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions." *Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir. 1996). The action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Factors to consider in determining whether an employee has suffered an adverse action are: (1) significantly changed responsibilities; (2) decreased salary; (3) less distinguished title; and (4) material loss of benefits. *Id.* at 886.

In the instant case, it is undisputed that after the realignment, Plaintiff's salary was unaffected, her title remained the same, her responsibilities were the same except that Plaintiff believes she had fewer of those responsibilities, and she did not lose any benefits. (Pl.'s Dep. at 12, 13-14, 17.)

In *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535 (6th Cir. 2002), the defendant airline went through some structural changes to focus on "opportunity" cities. As part of those changes, the defendant "reconfigured [plaintiff's] territory so that she would service customers in the Louisville/Lexington metropolitan areas." *Id.* at 537. The defendant indicated that the "change took into account the facts that [plaintiff] was experienced in domestic and transpacific sales and would not need training; she already spent thirty to forty percent of her time in the

Louisville/Lexington region; she had a strong contact base in the region; her largest account was in Louisville; she was better suited for the challenge of an opportunity city; and the new territory had the potential for helping her career." *Id.* The plaintiff was "unhappy with the reassignment" because she would have a longer commute and it "would deprive her of her ability to maintain her longstanding relationships with her Cincinnati clientele." *Id.* Plaintiff resigned eight months later. *Id.* at 538. The Sixth Circuit held that the plaintiff had failed to show sufficient adverse action to survive summary judgment because the "reassignment did not involve a reduction in salary, a decrease in benefits, a diminution in responsibilities, a modification of her title, or an increase in the size of her territory, and it was expected to advance her career." *Id.* at 539. I suggest that *Policastro* controls here and compels a conclusion that Plaintiff suffered no adverse employment action as a result of the realignment.

The instant facts stand in contrast to those in *Lees v. Thermo Electron Corp.*, No. C2-06-984, 2008 WL 4146375 (S.D. Ohio Sept. 4, 2008), where the plaintiff was a salesperson whose product line and territory were changed. The defendants contended that the plaintiff "expressed little interest in selling the new line . . . and chose to sell, almost exclusively, products from [the former customer] with which he was more familiar." *Id.* at *3. The court "disagree[d] that realigning a sales territory and placing an employee on performance improvement plans that ultimately serve as the basis for his or her termination may *never* constitute adverse employment action." *Id.* at 7 (emphasis in original). The court concluded that where the "territory realignment was accomplished to give substantially younger sales representatives [the plaintiff's] much more lucrative accounts, and that change materially and adversely changed his income," adverse employment action had been sufficiently alleged to survive summary judgment.

In the instant case, however, there has been no evidence that the realignment was done to benefit younger CRMs and simultaneously burden older CRMs; instead, the evidence shows the realignment was made throughout the company and affected CRMs and DNAs alike. (Dkt. 51, Ex. 6 at 16-17.) Even more importantly, there is no allegation that Plaintiff's income was detrimentally affected by the realignment. Thus, I find that *Lees* is factually distinct and does not apply here.

I therefore suggest that Plaintiff has suffered no adverse employment action as a result of Defendants' realignment of customer accounts, that Plaintiff has failed to state a prima facie case, and that Defendants' motion for summary judgment should be granted on this claim. *See James v. Metropolitan Gov't of Nashville*, 243 Fed. App'x 74 (6th Cir. 2007) (no adverse employment action where plaintiff was denied a request for a lateral transfer, received bad employment evaluations, and the employer imposed cataloguing quotas after she filed her charges with the EEOC because "none of these things . . . significantly affected her professional advancement; . . . [she] continued to work and she received the same pay . . . [and h]er employment conditions were essentially unchanged . . ."); *Sherman v. Chrysler Corporation*, 47 Fed. App'x 716, 722 (6th Cir. 2002) ("The positions into which he was seeking to transfer involved similar duties, title, pay, and conditions of work and the denial of those transfers did not, therefore, constitute adverse employment action."); *Radcliffe v. Whitlam Label Co.*, No. 07-CV-13946, 2008 WL 2568299 (E.D. Mich. June 24, 2008) (no adverse action where plaintiff "allegedly was chastised for mistakes which were caused by younger, male co-worker; a younger worker allegedly received a better parking spot; defendants allegedly 'wrote up' plaintiff for leaving work early, while a younger worker was allowed to do so; and plaintiff was reprimanded for violating the dress code, while younger workers were allowed to wear flip-flops [because] [t]hese allegations are frivolous in the extreme . . .").

Even if the realignment could be considered adverse employment action, I suggest that the result would be the same. "[W]hen an employer imposes an employment action that would be an adverse employment action but then quickly reverses the action, the employee has not suffered an adverse employment action." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005). The only client that was going to be taken from Plaintiff and transitioned to Ms. Eisengruber, Microsoft, was never actually transitioned and was officially reassigned back to Plaintiff within one year. (Pl.'s Dep. at 19.) Therefore, I suggest that, even if realignment could be considered adverse action, Plaintiff did not suffer from it and Defendant's motion for summary judgment should be granted as to this claim.

### b. Legitimate Nondiscriminatory Reason

Assuming, *arguendo,* that Plaintiff could meet her burden of establishing a prima facie case, the burden of production shifts to Defendant to come forward with a legitimate nondiscriminatory reason for the adverse employment action. *Carter*, 349 F.3d at 273. Defendants indicated that the realignment was done to "cut travel costs, increase CRM knowledge and involvement in their assigned territories, and increase client service." (Dkt. 47 at 10.) In addition, Defendants note that the realignment was done throughout the company as a whole and affected the DNAs as well. (Dkt. 51, Ex. 6 at 16-17.) Defendants' specific reasons for giving Plaintiff the Southern territory was that her "personality" was a fit and because Plaintiff's largest client, Halliburton, whom Plaintiff wanted to retain, was located in the South. (Dkt. 51, Ex. 12 at 9-10.) Accordingly, the burden of production then shifts back to Plaintiff to "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

### c. Pretext

A proffered reason is pretextual if it "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000). *See also Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008); *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991). In order to show that there was no basis in fact for the decision made, "a Plaintiff must put forth 'evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false.'" *Abdulnour v. Campbell Soup Supply Co. LLC*, 502 F.3d 496, 502-03 (6th Cir. 2007) (citations omitted) (granting summary judgment where "Plaintiff fails to provide evidence that these complaints were false, inaccurate, or not made"). In order to show that Defendant's proffered reason did not actually motivate Defendant's challenged conduct, "Plaintiff must show 'that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext or coverup.'" *Id.* at 503 (citations omitted). "The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) (quoted with approval in *White v. Baxter Healthcare*, 533 F.3d 381, 394 (6th Cir. 2008)).

"Pretext, however, cannot be shown by attacking the decision itself." *Hein v. All American Plywood Co., Inc.*, 232 F.3d 482, 490 (6th Cir. 2000). "A court 'may not reject an employer's explanation [of its action] unless there is sufficient basis *in the evidence* for doing so.'" *Brennan v. Tractor Supply Company*, 237 Fed. App'x 9, 20 (6th Cir. 2007) (emphasis in original) (quoting *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 600 (6th Cir. 2001). "Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses

employers' business judgments." *Simms v. Okla. ex re. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir. 1999) (quoted with approval in *Conner v. State Farm Mutual Auto Ins. Co.*, 273 Fed. App'x 438, 443-44 (6th Cir. 2008)).

Guided by these cases, I suggest that Plaintiff cannot demonstrate that Defendant's reasons did not "actually motivate" Defendant. Plaintiff has not come forward with any evidence to show that discrimination makes it "more likely than not" that the employer's explanation is a pretext. *Id.* at 503. Evidence of Defendant Thuge's dislike of Plaintiff, even if it were distinguishable from his alleged rude managerial style used to govern all employees, would be insufficient to show pretext. *Brennan*, 237 Fed. App'x at 21. Nor has Plaintiff shown how Defendant's realignment decisions were so "idiosyncratic" or "questionable" that only pretext, based on age or weight, could explain otherwise obtuse decisions. *Loeb*, 600 F.2d at 1012. Finally, the fact that Plaintiff was hired by Defendant GMACM at age 56 militates against Defendant harboring a pretextual age discriminatory motive. *See Hemmert v. Quaker Oats Co.*, 157 F. Supp. 2d 864, 875 (S.D. Ohio 2000) (granting summary judgment where there was no evidence that defendant's "go-to-market' re-engineering plan" was a pretext for age discrimination and where the plaintiff had just been "re-hired" by defendant company "just two years earlier at the age of forty-eight, which was well within the age group protected by the ADEA."); c*f. Blair v. Henry Filters, Inc.*, 505 F.3d 517, 530 (6th Cir. 2007)(evidence sufficient to survive summary judgment where plaintiff's direct supervisor "repeatedly mocked [plaintiff's] age," "removed [plaintiff] from a lucrative account because of his age," and "told other employees he wanted a younger salesman," where there was evidence that this supervisor participated in the decision to terminate plaintiff and where actions taken were not part of an objective plan to reduce the force but were chaotic).

I therefore suggest that even if Plaintiff could establish a prima facie case on this claim, since there is no evidence tending to show that Defendant's proffered reason was a pretext for discrimination, Defendant's motion for summary judgment should be granted on this claim.

## 2.      Failure to Promote Claim

### a.      Prima Facie Case

A failure to promote may constitute adverse action. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 410 (6th Cir. 1999). Plaintiff complains that she should have received promotions to supervisory CRM and telesales manager.

Ms. Hertel made the decision to promote one of the CRMs to a supervisory position and she chose Mr. Bailey over Plaintiff because he "had a stronger management background because he used to be a branch manager for I believe Standard Federal at the time." (Dkt. 51, Ex. 6 at 14.) Plaintiff contends that she was told that she was not promoted because Mr. Bailey got along with Defendant Thuge better than she did. Ms. Hertel initially denied selecting or telling anyone that she selected Mr. Bailey over Plaintiff because he had a better relationship with Defendant Thuge but later stated that it was "part of the reason." (Dkt. 51, Ex. 6 at 14, 31-32.) Ms. Hertel added that she also chose Mr. Bailey over Plaintiff "[b]ecause of the personality of Karl [Thuge] that it would be a better fit" based on "the meetings, he's very demanding, very his way," "interrupts people" and is "rude." (Dkt. 51, Ex. 6 at 15.) [6] Plaintiff believes that she should have been promoted to the CRM team lead position rather than Michael Bailey because she and Mr. Bailey were "equal candidates." (Pl.'s Dep. at 25.) Plaintiff also thought she was not promoted because of her age and weight since Mr. Bailey is younger than Plaintiff and is of "average, normal weight." (*Id.*)

_____

[6]Although there was some discussion of Plaintiff's computer skills, Defendant Thuge acknowledged that Plaintiff knew how to use a computer as required for the CRM supervisory job but he felt that she did not have the analytical skills for the position. (Dkt. 51, Ex. 4 at 18, 20.)

Plaintiff also complains that her failure to receive a promotion to telesales manager was based on age because that position was given to Nina Arnez, who was in "her 20s." (*Id*. at 26-27.) Although Plaintiff considered herself qualified for that position, Bob Sparrow, who interviewed her and made the decision, did not. (*Id*. at 27, Ex. 6 at 22-23.) Plaintiff has indicated that she attributes discriminatory animus to Defendant Thuge alone. (*Id*. at 21.) As noted above, the promotion decisions were made by Ms. Hertel and Mr. Sparrow, not Defendant Thuge.

"We recognize that the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process." *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2nd Cir. 1999) (citations omitted) (no evidence alleged biased individual played a meaningful role where he was one of six student members on committee who made a recommendation to the decision-making committee) (cited with approval in *Reid v. Michigan Dep't of Corrections*, 101 Fed. App'x 116, 121 (6th Cir. 2004) (no evidence person giving poor reference played a meaningful role where evidence not clear that reference was considered by decision-maker and there was no evidence it served as a "catalyst" for discrimination, especially where author did not sit on any of the panels making decisions)). An individual plays a meaningful role when his assessment is submitted as a recommendation, is approved and is ultimately acted upon. *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004); *Hussain v. Highgate Hotels, Inc.*, 126 Fed. App'x 256, 262-63 (6th Cir. 2005). Merely discussing a person subject to an employment decision with a decision-maker, absent evidence that any assessment made was expressly adopted by the decision-maker, is insufficient. *Vredevelt v. GEO Group, Inc.*, 145 Fed. App'x 122, 132-33 (6th Cir. 2005); *Bickerstaff, supra; Reid, supra*.

I suggest that Plaintiff's speculation that Defendant Thuge's view of her affected the decisions of Ms. Hertel or Mr. Sparrow are inadequate to show that Defendant Thuge played any meaningful role in the decisions not to promote Plaintiff.  I further suggest that the decision to promote Mr. Bailey rather than Plaintiff cannot support a claim for discrimination because Plaintiff has conceded that she and Mr. Bailey were equally qualified and an "employer has discretion to chose among equally qualified candidates . . . ."  *Burdine*, 450 U.S. at 259; *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006).

### b.    Legitimate Nondiscriminatory Reason

Assuming, *arguendo,* that Plaintiff could meet her burden of establishing a prima facie case, the burden of production shifts to Defendant to come forward with a legitimate nondiscriminatory reason for the adverse employment action.  *Carter*, 349 F.3d at 273.  Defendant GMACM indicated that Plaintiff was not promoted to the position of supervisory CRM because Mr. Bailey "had a stronger management background" and because Mr. Bailey had a better relationship with Defendant Thuge.  (Dkt. 51, Ex. 6 at 14, 31-32.)

As to the telesales manager promotion, Defendants contend that Plaintiff was not chosen for the position because Plaintiff was not qualified for that position. (Dkt. 51, Ex. 6 at 22-23.)

Accordingly, the burden of production then shifts back to Plaintiff to "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

### c.    Pretext

I suggest that Plaintiff cannot demonstrate that Defendant GMACM's reasons did not "actually motivate" Defendant nor has Plaintiff come forward with any evidence to show that discrimination makes it "more likely than not" that the employer's explanation is a pretext. *Abdulnour,* 502 F.3d at 503.  The evidence shows that those promoted over Plaintiff were either

equally qualified or more qualified and Plaintiff has failed to proffer any evidence that Defendant's decisions were so "idiosyncratic" or "questionable" that only pretext could explain otherwise obtuse decisions. *Loeb*, 600 F.2d at 1012. *See also Hunter v. Green*, No. 07-14490, 2008 WL 1925065, at *9 (E.D. Mich. May 1, 2008) (evidence was insufficient to show pretext where employer temporarily stopped one of plaintiff's projects indicating it needed more information and where plaintiff did not receive desired transfer because he did not get along with the supervisor at the desired location).

I therefore suggest that even if Plaintiff could establish a prima facie case of discrimination relating to the realignment of CRM territories, since there is no evidence tending to show that Defendant GMACM's proffered reasons were a pretext for discrimination, Defendant's motion for summary judgment should be granted on this claim.

### 3. Claim Against Defendant GMAC GRS

### a. Prima Facie Case

It is undisputed that Plaintiff is a member of a protected class based on age under the ADEA and ELCRA and based on weight under ELCRA alone. I have not found evidence indicating whether Plaintiff was replaced by a younger person of normal weight. Since the parties did not argue this element, I will, for purposes of this motion only, assume this element could be satisfied. It is also undisputed that Plaintiff was subject to adverse employment action since she was terminated from her position at GMAC GRS. The element that is subject to debate in this instance is whether Plaintiff was qualified for the position at GMAC GRS. *See Wright,* 455 F.3d at 707.

"At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified . . . such as education, experience in the relevant industry, and possession of the required general skills." *Coburn v. Rockwell Automation, Inc.*, 238 Fed.

App'x 112, 128 (6th Cir. 2007). Plaintiff contends that her employment at GMAC GRS was tainted by conversations between Defendant Thuge and her supervisor, Ms. Taylor, wherein Defendant Thuge allegedly told Ms. Taylor that Plaintiff was known for having difficulty with management and office gossip. (Pl.'s Dep. at 41-42.) These two comments are the only comments that Plaintiff attributes to conversations between Defendant Thuge and Ms. Taylor. (*Id*. at 42.)

At a meeting on January 16, 2006, Ms. Taylor told Plaintiff that her skill level with respect to Microsoft Word, Excel, and Powerpoint was not meeting the expectations of her position and that Plaintiff needed to pay more attention to details. (*Id*. at 42-43.) Plaintiff felt as if she "could never meet [Ms. Taylor's] expectations." (*Id*. at 42.) Plaintiff was placed on a performance plan but failed to meet expectations and was terminated. (*Id*. at 44.)

I suggest that Plaintiff's speculation that conversations between Defendant Thuge and Ms. Taylor affected Ms. Taylor's decision to terminate Plaintiff suffers from the same fatal flaw as her claim based on GMACM's failure to promote. The evidence is inadequate to show that Defendant Thuge, the only person alleged to have any discriminatory animus, played any meaningful role in the decision to terminate Plaintiff. I therefore suggest that Plaintiff has failed to alleged a prima facie case of discrimination against Defendant GMAC GRS and that summary judgment should be granted.

**b.  Legitimate Nondiscriminatory Reason**

Assuming, *arguendo,* that Plaintiff could meet her burden of establishing a prima facie case against Defendant GMAC GRS, the burden of production shifts to Defendant to come forward with a legitimate nondiscriminatory reason for the adverse employment action. *Carter*, 349 F.3d at 273. Defendant GMAC GRS asserts that its reason for terminating Plaintiff was that Plaintiff was unable to perform the job to the satisfaction of her supervisor and Plaintiff conceded that she

felt she never could meet her supervisor's expectations. (Pl.'s Dep. at 42-44.) Accordingly, the burden of production then shifts back to Plaintiff to prove that the proffered reason was actually a pretext to hide unlawful discrimination.

### c. Pretext

I suggest that Plaintiff cannot demonstrate that Defendant's reasons did not "actually motivate" Defendant since Plaintiff admits she was not meeting expectations. *See Abdulnour,* 502 F.3d at 503. The evidence reveals that Plaintiff was not qualified for the position at GMAC GRS due to her failure to meet Ms. Taylor's expectations; Plaintiff's frustration with her inability to please Ms. Taylor only adds to that showing. *See also Kozlevcar v. Tom Ahl Buick, Inc.*, No. 3:05 CV 07843, 2007 WL 2344782, at *7 (N.D. Ohio Aug. 15, 2007) (finding plaintiff unqualified despite "ten years of continuous experience in the car sales industry" and "in-depth knowledge of the product" where plaintiff was "fired for inadequate job performance as a salesperson, the job that Plaintiff held three months prior to his discharge . . . [because] Plaintiff was not doing his job within the Defendant's expectations").

I therefore suggest that, even if Plaintiff could establish a prima facie case, since there is no evidence tending to show that Defendant's proffered reason was a pretext for discrimination, Defendant's motion for summary judgment should be granted as to this claim.

### E. Retaliation Claims

### 1. Standards

The elements of a prima facie case of retaliation under the ADEA are: (1) that the plaintiff engaged in protected activity, (2) that exercise of her protected civil rights was known to the defendant, (3) that the defendant thereafter took an employment action adverse to the plaintiff, and

(4) there was a casual connection between the protected activity and the adverse employment action. *Imwalle*, 515 F.3d at 544.

In *Burlington North & Santa Fe Railway Co. v. White,* 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), the United States Supreme Court held that "Title VII's substantive provision and its anti-retaliation provision are not coterminous [in that] [t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm . . . [and] rejecting the standards of the Courts of Appeals that have treated the anti-retaliation provision as forbidding the same conduct prohibited by the anti-discrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.'" *Id*. at 67. The Court explained that a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might well have "dissuaded a reasonable worker from making or reporting a charge of discrimination."'" *Id*. at 68 (citations omitted). Consequently, retaliatory actions may now be brought where an employer takes "actions not directly related to his employment or by causing him harm *outside* the workplace," such as where the employer files false criminal charges against a former employee who complained about discrimination. *Id.* at 63 (emphasis in original). "[R]eassignment of job duties is not automatically actionable," instead, the question of "[w]hether a particular assignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (citation omitted) (finding reassignment materially adverse where new track labor duties were more arduous and dirtier, had less prestige, and where the job was objectively viewed as less desirable).

If a plaintiff meets her burden of establishing a prima facie case, the burden of production shifts to the defendant to come forward with a legitimate nondiscriminatory reason for the adverse

employment action. *Carter*, 349 F.3d at 273. If a defendant articulates a legitimate nondiscriminatory reason, the burden of production then shifts back to Plaintiff to "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

### 2. Defendants GMACM and Thuge

Plaintiff's retaliation claim against GMACM and Thuge is based on the fact that she felt shunned by the management team (Defendant Thuge and Mr. Bailey), that her clients were immediately transitioned away from her, and that she feared for her job constantly. (Pl.'s Dep. at 40.)

Plaintiff engaged in protected activity when she complained to human resources and filed an action with the EEOC that was known to Defendant GMACM. However, for the same reasons as indicated above relating to the discrimination claim against Defendant GMACM, I suggest that Plaintiff did not suffer any adverse employment action nor has there been sufficient evidence of a causal link between the protected activity and any actions taken by Defendant. Therefore, I suggest that Plaintiff cannot state a prima facie case of retaliation against Defendant GMACM and that summary judgment should be granted on this ground.

Even if a prima facie case were stated, I further suggest that Plaintiff has not shown that Defendants' legitimate reasons were a pretext for retaliation for all the reasons stated under the discrimination claims.

### 3. Defendant GMAC GRS

Plaintiff suffered an adverse employment decision from Defendant GMAC GRS when she was terminated. However, Defendant GMAC GRS contends that Plaintiff's protected activity, her claim against GMACM, was not known to Defendant GMAC GRS, nor could there have been a casual connection between the protected activity and the adverse employment action. Plaintiff's

only evidentiary basis for attributing knowledge from GMACM to GMAC GRS are the alleged conversations between Defendant Thuge and Plaintiff's supervisor, Ms. Taylor, wherein Defendant Thuge allegedly told Ms. Taylor that Plaintiff was known for having difficulty with management and office gossip. (Pl.'s Dep. at 41-42.) Even if these conversations occurred, they did not address Plaintiff's protected activity. Thus, I suggest that Plaintiff cannot establish a prima facie case of retaliation against Defendant GMAC GRS and summary judgment should be granted.

Even if a prima facie case were stated, I further suggest that Plaintiff has not shown that Defendant's legitimate reasons for termination were a pretext for retaliation for all the reasons stated under the discrimination claims.

**F.      Hostile Work Environment Claim**

**1.      Standards**

To establish a prima facie case of a hostile work environment, Plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment unreasonably interfered with the plaintiff's work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective action. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008).

The hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Courts consider "all of the circumstances," such as "frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*

*v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993). The harassment must be extreme to meet this standard. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. *See also Smith v. Leggett Wire Co.*, 200 F.3d 742, 760-61 (6th Cir. 2000) (one racial slur directed at plaintiff and racially offensive cartoons and reference to an African American employee as a "gorilla" were not sufficiently severe or pervasive to state a prima facie case); *Kelly v. Senior Centers, Inc.*, 169 Fed. App'x 423, 429 (6th Cir. 2006) (use of the N-word in referring to participants in a program Defendant sponsored, an executive's description of a board member as a "token black," comments that participants were "slovenly" or "pigs" at meals, three racist jokes and rude comments regarding African American staff members' bathroom habits did not amount to a "pervasive, aggressive, or constant course of conduct.").

## 2.     Factual Basis

As to weight discrimination, Plaintiff points to Defendant Thuge's comment, "do you really need that?," when Plaintiff approached a co-worker's candy jar, comments that it was important to exercise and watch what you eat, and comment that something she was wearing didn't match, all of which led Plaintiff to be "self-conscious around him about [her] appearance." (Pl.'s Dep. at 21.)[7]

As to age discrimination, several comments are proffered to show a hostile work environment. Logic requires that if Plaintiff "did not hear" a comment, "it could not have contributed to [Plaintiff] experiencing a hostile work environment." *Mazur v. Wal-Mart Stores,*

---

[7]Ms. Mattson never heard Defendant Thuge say anything about Plaintiff's weight, about Plaintiff needing to exercise or that Plaintiff should avoid candy or any other food item. (Dkt. 51, Ex. 13 at 6.) However, for purposes of this motion, it is assumed that these comments were made.

*Inc.*, 250 Fed. App'x 120, 128 (6th Cir. 2007). In the instant case, although Ms. Mattson remembered Defendant Thuge referring to Plaintiff as a "grandmother" or as "the grandmotherly type, warm and affectionate," Plaintiff did not recall that incident. (Dkt. 51, Ex. 13 at 7; Pl.'s Depl at 37.)[8] Therefore, I suggest that this alleged comment could be excluded from the hostile work environment claim consideration. However, for purposes of this motion, I will assume that the comment was made.

In January 2006, Sherry Hertel complained of Defendant Thuge making a comment that Ms. Hertel had "nice hair, if it was 20 years in the past." (Dkt. 51, Ex. 11 at 10.) Ms. Hertel was "insulted" and Mr. Berkelbach spoke with Defendant Thuge about the comment and Defendant Thuge apologized to Ms. Hertel. (Dkt. 51, Fogarty Dep., Ex. 11 at 10; Hertel Dep., Ex. 6 at 25.) Defendant Thuge stated he "very possibly could have" made the comment about Ms. Hertel's hair being outdated at the 2005 Christmas party and he did recall Ms. Fogarty and Mr. Berkelbach telling him to "[w]atch [his] humor in settings outside the workplace." (Dkt. 51, Ex. 4 at 24.) Ms. Hertel "felt it was a hostile work environment" "[b]ecause once again, [Defendant Thuge] was being blunt and rude to people and I happened to be the recipient of that, along with Bill." (Dkt. 51, Ex. 6 at 28.)

The other alleged comments include Defendant Thuge's statement to Plaintiff in the airport while traveling to Halliburton in Texas that "if you were a horse, they would shoot you." (Pl.'s Dep. at 29-30.) Plaintiff believes this statement is related to both her age and weight because, as she stated, "I was moving slowly and not as spry and cannot get through an airport as quickly as

---

[8]Even if Plaintiff had heard the statement, it may not have been considered derogatory. Ms. Mattson stated that she knew Plaintiff would not like the statement simply because Plaintiff did not like Defendant Thuge, not because any older worker would have objected to such a comment. (Dkt. 51, Ex. 13 at 8.) Ms. Mattson stated that if she had said the same thing, "it would be different," i.e., Plaintiff would not have been offended. (Dkt. 51, Ex. 13 at 8.)

a younger, less overweight person can." (*Id.* at 30.)[9]   When speaking with Ms. Wertman, Defendant Thuge did not deny or confirm that he made the "horse" comment.  (Dkt. 51, Ex. 12 at 9.)

Finally, Plaintiff proffers Defendant Thuge's comment that Plaintiff was assigned to the South because "her personality fit the south versus the west coast." (Dkt. 51, Thuge Dep., Ex. 5 at 11.)  Kari Mattson stated that her understanding of Karl Thuge's comment that Plaintiff "was a better fit with our Southern clients" was "just personality wise" because Plaintiff "would be really likeable."  (Mattson Dep., Dkt. 51, Ex. 13 at 5.)

There is also evidence regarding the general atmosphere under the tutelage of Defendant Thuge.  Mr. Berkelbach considered that most of the "objections to Karl [Thuge] fell in [his] mind to resistance to change [because Defendant Thuge] was not afraid of undoing the status quo, and [he] encouraged and supported that, although [he] recognized that some staff members wished that we could turn the clock back and just be like John Rasmussen."  (Dkt. 51, Ex. 10 at 6.)  Mr. Berkelbach described the main criticism of Defendant Thuge was that he was "abrasive, aggressive, New York style versus calm, reassuring, Midwestern style." (Dkt. 51, Ex. 10 at 8.)  Mr Berkelbach explained:

> A business has a personality.  The business personality had taken John's, and John's was largely laid back much more than Karl's.  So that was where almost every comment that I had regarding Karl was around those issues.  The discussion I had with Caron [Eisengruber], I believe, also spilled over into one of the same objections that Sandy had, and that is, 'Why are we changing successful territory alignment. The status quo worked.  Tell him to leave it alone.'

(Dkt. 51, Ex. 10 at 8.)  Mr. Berkelbach's response was:

---

[9]When asked whether Plaintiff ever said anything like "if you were a horse, they would shoot you," Defendant Thuge responded that Plaintiff would "say things along the lines of, God, what was I thinking when I did this to my hair or what was I thinking when I got this hair cut or what was I thinking when I bought this or – so that would not surprise me for [Plaintiff] to have said that about herself."  (Dkt. 51, Ex. 4 at 17.)

'I am not going to do that. You know that this change was initiated at least 90 days before John Rasmussen left with John's blessing. And I can find nothing illogical about dissolving a structure that had three different CRMs flying into the state of Washington in a given month.'

(Dkt. 51, Ex. 10 at 9.)

Mr. Nasr stated that he enjoyed working for Mr. Rasmussen but did not have a good relationship with Defendant Thuge, whom he described as "extremely domineering," "[r]ude," "[c]ondescending, egotistical, [and] dogmatic." (Dkt. 51, Ex. 8 at 6.) Mr. Nasr considered the workplace an "extremely hostile environment" based on Defendant Thuge's characteristics. (Dkt. 51, Ex. 8 at 6.) Mr. Nasr recalled a meeting where the CRMs were rehearsing presentations that they would later do for clients where Defendant Thuge was "particularly hostile towards [Plaintiff]":

> She was clearly nervous about it. She was forgetting her lines and stuttering and breathing heavy and asking if we could just take a break and let her kind of re-- get her arm around what she was supposed to do...

(Dkt. 51, Ex. 8 at 7.) Defendant Thuge would not let Plaintiff take any break and he made Plaintiff do her 10-15 minute presentation over again for a total of approximately 45 minutes. (Dkt. 51, Ex. 8 at 7-10.)

### 3. The Investigation

Plaintiff contends that the investigation by Defendant GMACM was inadequate. (Dkt. 51, Ex. 2 at 36, 38.) Lori Wertman, human resources consultant for Defendant GMACM, investigated Plaintiff's complaint about Defendant Thuge. (Wertman Dep., Dkt. 51, Ex. 12 at 4.) Eileen Fogarty, director of human resources, recalled a meeting in August 2005 between herself, Mr.

Berkelbach and Ms. Hertel, to discuss Plaintiff's concerns, after which a letter was drafted to Defendant Thuge. (Fogarty Dep., Dkt. 51, Ex. 11 at 5-6).[10]

Defendant Thuge indicated that, as a result of Plaintiff's complaints, he was not "brought up on any disciplinary action . . . [but w]e had conversations, we talked about maintaining professional environment at all times, zero tolerance, that kind of thing, I don't consider that disciplinary." (Dkt. 51, Ex. 4 at 21.) Defendant Thuge stated that he was never given any "verbal warnings" and that he "was told to be professional. So, no, [he] was not told to change anything." (Dkt. 51, Ex. 4 at 21.)

Mr. Berkelbach, President of GMACM, stated that in 2004-05, he spoke with Ms. Hertel "about specific shortcomings that she felt she had with Karl [Thuge]" five or six times. (Berkelbach Dep., Dkt. 51, Ex. 10 at 5-7.)

**4. Discussion**

There is an abundance of evidence establishing that many employees did not like Defendant Thuge and considered the environment unpleasant and "hostile." (Dkt. 51, Nasr Dep., Ex. 8 at 6-10; Mattson Dep., Ex. 13 at 9-10 (Thuge was the reason for Eisengruber and Nasr leaving employment); Hertel Dep., Ex. 6 at 4-5 (Hertel made a lateral transition in GMACM from vice president to director of operations to avoid reporting to Defendant Thuge); Ex. 6 at 5-6 (Hertel stated Defendant Thuge was "very demanding," "very hard to get along with" and he would correct her in front of her peers).) However, there is a paucity of evidence that could even imply hostility based on age or weight.

---

[10]Eventually, Defendant GMACM told Defendant Thuge that it "needed to take that business in a different direction"; Defendant Thuge was not "terminated," but left the area by "mutual agreement." (Dkt. 51, Ex. 11 at 9.)

The comment regarding plaintiff being a "grandmotherly type," if made at all, is ambiguous and was considered by one employee to be complimentary, as referring to Plaintiff's warm and caring attitude. (Dkt. 51, Ex. 13 at 7.) Defendant Thuge's comment to Plaintiff that "if you were a horse, they would shoot you" is also ambiguous. Although Plaintiff believes that this statement is related to both her age and weight, moving slowly is not the exclusive providence of the aged or the overweight; slowness in an airport could just as easily be attributed to a person being distracted, having a more laid-back personality, a smaller or slower gait, etc.

Defendant Thuge's comment that Ms. Hertel had "nice hair, if it was 20 years in the past" was made in tandem with a comment about Mr. Berkelbach's mustache being out of fashion. (Dkt. 51, Ex. 11 at 10; Ex. 6 at 27 (Defendant Thuge stood up at a party and said something like "before we get into our numbers, I would like to say a couple things and he said Sherry your hairdo of the 70s has got to go and Bill your . . . something about Bill's mustache.").) I suggest this statement is also ambiguous in that it could be viewed as Defendant Thuge's criticism of persons for their outdated style rather than their age itself, although it could also be viewed as pertaining to age since people who were alive when the outdated styles were popular would be older people.

I nevertheless suggest that the above comments, even if they were unambiguous comments regarding age, are more correctly characterized as "simple teasing, offhand comments, and isolated incidents" that do "not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. I further suggest the comments regarding Plaintiff's food intake are similarly offhand and isolated and do not support a prima facie case of a hostile environment based on weight discrimination under ELCRA.

Finally, although the stated reason for assigning Plaintiff to the Southern territory is an important matter, I suggest that it is also ambiguous and insufficient to survive summary judgment,

even when viewed in light of the other comments above. Defendant Thuge told Plaintiff that he assigned her the South because "her personality fit the south versus the west coast." (Thuge Dep., Dkt. 51, Ex. 5 at 11.) Defendant Thuge explains that by matching personalities, he considered generalities such as abrasiveness and the desire for small talk. (Dkt. 51, Ex. 12 at 9-10; *see also* Bailey Dep., Ex. 7 at 6.)

Plaintiff herself did not immediately connect "personality" with "age." When Plaintiff was asked whether she "[understood] that comment about you being assigned the south because your personality fit the south had some kind of reference or connection to your age," Plaintiff responded that she "was very confused by it, so I will not say yes or no, I was offended by it." When Plaintiff was further asked why she was offended, she responded, "Not knowing what he meant by my personality and not knowing why my personality did not meet the criteria to work on the west coast and what about my personality made me suitable for the south versus a different territory." (Pl.'s Dep. at 11-12.) Plaintiff's confusion seems to stem from her feeling that although she agreed with Defendant Thuge that she "had a good relationship with [her] clients in the south . . . [she also] had a good relationship with all of [her] clients." (Pl.'s Dep. at 11.) Plaintiff did not want to "lose" any of "her" accounts and would not appear to have been happy with any change in account assignments. Plaintiff's rationale for construing "personality" as synonymous with "age" was based solely on the fact that the west coast territory was given to Ms. Eisengruber, a younger person, and her stereotype that client contacts on the west coast were also generally younger. (Pl.'s Dep. at 12.)

I suggest that although there is evidence that the business environment changed for the worse after Mr. Rasmussen left and Defendant Thuge took over, there is insufficient evidence to state a prima facie case that the environment was hostile based on age or weight. Furthermore,

since Defendant took corrective action with respect to the rude and allegedly ageist comments made to Plaintiff and Ms. Hertel, a prima facie case cannot be established.

### G.    State Law Claim of Defamation

The elements of a defamation claim in Michigan are: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Mitan v. Campbell*, 474 Mich. 21, 24, 706 N.W.2d 420 (2005).[11]

Plaintiff asserts that Defendant Thuge made defamatory statements to Ms. Taylor, her supervisor at GMACM GRS, that Plaintiff was known for having difficulty with management and that she was known for office gossip. (Pl.'s Dep. at 41-42.) Plaintiff also claims that Defendant Thuge's comments that if she were a horse she would be shot and that she should avoid the candy jar were also defamatory, but she fails to allege that they were ever communicated to anyone but herself and therefore they cannot support a claim for defamation.

"If a statement cannot be reasonably interpreted as stating actual facts about the plaintiff, it is protected by the First Amendment." *Ireland v. Edwards*, 230 Mich. App. 607, 614, 584 N.W.2d 632 (1998) ("The question whether someone is a 'fit' mother, like the question whether someone is abysmally ignorant, is necessarily subjective . . . [and is] not actionable."). "[S]ubjective opinions [that] are not provable as false" are not actionable. *Mino v. Clio School District*, 255 Mich. App. 60, 77, 661 N.W.2d 586 (2003). I suggest that the alleged defamatory statements regarding Plaintiff's difficulty with management and penchant for office gossip are, at

---

[11]There is also some evidence that Defendant Thuge was not the only person that noticed Plaintiff's alleged tendency toward gossip. Plaintiff recalled Mr. Bailey having a conversation with her about her being too involved in office gossip. (Pl.'s Dep. at 27-28.)

most, mere subjective opinions rather than factual statements and are not actionable. Therefore, I recommend that summary judgment on this claim is proper.

I further suggest that, even if the statements were factual, they are not actionable because "an employer has a qualified privilege to divulge information regarding a former employee to a prospective employer." *Gonyea v. Motor Parts Federal Credit Union*, 192 Mich. App. 74, 79, 480 N.W.2d 297 (1991). A plaintiff may overcome this privilege only by a showing that the defamatory statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth. *Id.* I suggest that the instant Plaintiff has not alleged any facts revealing actual malice and thus, that summary judgment is appropriate for this reason as well.

### H.    Conclusion

For all the reasons stated above, I suggest that Defendants' motion for summary judgment be granted in its entirety and that the case be dismissed with prejudice.

### III.    REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Social Security*,

474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich.

LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


s/ 𝒞harles 𝓔 𝓑inder

CHARLES E. BINDER
United States Magistrate Judge

Dated: November 20, 2008



## **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Amy J. DeRouin, Charles C. Dewitt, Jr., Susan K. Fitzke, Christopher J. Trainor, William J. Vincent and Kathryn Mrkonich Wilson, and served on District Judge Ludington in the traditional manner.


Date:  November 20, 2008          By     s/Patricia T. Morris
                                         Law Clerk to Magistrate Judge Binder