UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SANDRA J. HAYWARD,

        Plaintiff,

                            Case Number 07-10622-BC
v.                                    Honorable Thomas L. Ludington

KARL THUGE, GMAC GLOBAL
RELOCATION SERVICES, LLC,
and GMAC MORTGAGE, LLC,
*f/k/a GMAC Mortgage Corp.*,

        Defendants.
_____/

**ORDER ADOPTING REPORT & RECOMMENDATION, OVERRULING OBJECTION, AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sandra J. Hayward's complaint advances causes of action for employment discrimination and retaliation pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.§ 621 *et seq*., and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2201 *et seq*, and defamation. Dkt. # 14. On September 2, 2008, Defendants Karl Thuge ("Defendant Thuge"), GMAC Global Relocation Services, LLC ("Defendant GMAC GRS"), and GMAC Mortgage, LLC ("Defendant GMACM") requested summary judgment pursuant to Fed. R. Civ. P.56. Dkt. # 47. On reference from this Court, Magistrate Judge Charles E. Binder issued a report and recommendation that the motion be granted in its entirety. Dkt. # 55. Plaintiff timely filed an objection. Dkt. # 56. For the reasons stated below, the Court will **ADOPT** the report and recommendation, **OVERRULE** Plaintiff's objection, and **GRANT** Defendants' motion for summary judgment.

I

For the most part, the parties agree on the underlying facts, but disagree on application of the law. Thus, except where the parties object to the magistrate judge's characterization of the record, the Court will rely on the factual summary provided in the report and recommendation, which states in pertinent part as follows:

> In 2002, Plaintiff was hired by Defendant General Motors Acceptance Corporation Mortgage ("GMACM"). She was 56 years old at that time. GMACM provided mortgage services to clients wishing to assist their employees who were being transferred to new locations. Plaintiff was hired as a Client Relations Manager ("CRM") under the direct supervision of John Rasmussen. Plaintiff stated in her deposition that she is five feet and three inches tall and that she weighed approximately 194 pounds when she worked at GMACM as a CRM.
>
> John Rasmussen, senior vice president at GMACM, clarified that CRMs are the "main point of contact for existing clients," they "answer and respond to client questions," meet the "day to- day needs of the clients," "bring[] them trends and ideas that were happening in the mortgage industry that might help them with their relocation program," and they "report[] back on the performance of our services."
>
> When asked whether there were specific geographic territories assigned to CRMs in 2002, Mr. Rasmussen responded that GMACM "tried to group them together as much as we can . . . and it wasn't always that cleanly lined up . . . [and] the [CRMs] did travel, especially to bigger clients [s]o, if you could get all your Denver clients, you know, signed to the same [CRM] . . . that made it more efficient." Plaintiff was responsible primarily for West Coast clients and some accounts in Texas (e.g., Halliburton). Michael Nasr was assigned to the Midwest and West Coast, Caron Eisengruber was assigned to the Northeast, Susan Maylone was assigned to General Motors in Detroit, Michigan, and Michael Bailey was assigned to the Northeastern portion of the United States.
>
> Mr. Rasmussen stated that Plaintiff was a "good employee" and was "very good with contract review and those discussions with clients, she had good technical skills and good industry knowledge," she "conduct[ed] herself as a professional" and he did not recall any complaints from her clients nor did he ever have any problems with Plaintiff.
>
> In August 2004, because Defendant GMACM was growing in its client base, an additional managerial position was created. Defendant Karl Thuge ("Thuge") assumed the position of Vice President of Client Relations and Business Development and he became responsible for supervision of the CRMs, including Plaintiff, Susan Maylone (age 56), Caron Eisengruber (age 36), Michael Bailey (age 44) and eventually Michael Nasr (age 37). Defendant Thuge worked for GMACM until March 1, 2007, and he reported to John Rasmussen until he assumed Mr.

Rasmussen's position at which time he began reporting to Bill Berkelbach.

In August through September of 2004, client assignments were realigned by Defendant Thuge and possibly with the aid of Mr. Rasmussen. As a result of the realignment, Plaintiff was assigned the South, Michael Bailey the Northeast, Caron Eisengruber the West, and Sue Maylone General Motors in Detroit. Michael Bailey and Sue Maylone were largely unaffected. Caron Eisengruber's client base changed from the Northeast to the West and Plaintiff's changed from the West with some Southern clients to the South alone. Plaintiff stated that she, Ms. Eisengruber, and Mr. Nasr were all unhappy with the changes. After the realignment, Plaintiff was no longer assigned to some former significant clients in the West such as Northrop Grumman, American Honda, and the Gap. Defendant pointed out in oral argument that, although Plaintiff refers to certain clients as being "hers," all of the entities are actually clients of the Defendant corporation and not of any one CRM.

Defendant contends that this realignment was done to "cut travel costs, increase CRM knowledge and involvement in their assigned territories, and increase client service." Plaintiff contends that the reason for realignment was to "match personalities" of the CRMs with the various clients and further contends that "personality" was a code word for "age." Plaintiff further complains that although she worked hard to obtain Microsoft as a customer, Defendant Thuge removed her from the account "because the contact at Microsoft was significantly younger than she and therefore Caron Eisengruber (36) was asked to service it." On the other hand, Defendant states that because one of Plaintiff's larger clients was Halliburton, whose headquarters was located in Texas, Plaintiff was assigned the South. Plaintiff concedes that Halliburton was a desirable account that she wanted to retain.

The reorganization and realignment also affected the directors of national accounts ("DNA"s), e.g., Heather Goss, Chris Chalk and Matt Canfield. DNAs "were the executives that would go out and call and bring new business on board, a new client on board [and the CRMs'] main responsibility was to maintain that relationship."

Defendant Thuge and Plaintiff agree that Defendant Thuge's stated reason for assigning Plaintiff the South was because "her personality fit the south versus the west coast." Michael Bailey, CRM and eventually supervisory CRM, stated that the realignment was done because "[t]hey wanted to make sure that — 'they' being Karl Thuge and John Rasmussen, wanted the personalities to fit the account client representation – representatives." He explained that "a lot of clients in New York and New Jersey really like to have answers immediately. They don't want to mess around with small talk . . . [t]hey're strictly bottom line type people . . . ." He added that because he fit that "type," he was able to work with East Coast clients and he added that this attribute may also have helped him get along with Defendant Thuge.

When Plaintiff was asked whether Defendant Thuge explained what he meant by her personality fitting the South, Plaintiff responded, "Just that I had a good relationship with my clients in the south, which I did, but I had a good relationship with all of my clients." Similarly, when Plaintiff was asked, "Do you understand that comment about you were being assigned the south because your personality fit the

-3-

south had some kind of reference or connection to your age?" Plaintiff responded," I was very confused by it, so I will not say yes or no, I was offended by it." Plaintiff was further asked, "Why were you offended?" Plaintiff responded, "Not knowing what he meant by my personality and not knowing why my personality did not meet the criteria to work on the west coast and what about my personality made me suitable for the south versus a different territory." Plaintiff stated that she does not remember Defendant Thuge providing any clarification about what he meant by "personality" but Plaintiff gleaned from his "actions, that [her] appearance and [her] age did not fit with the age group of the clients on the west coast." When further asked what actions led her to this conclusion, she responded, "Just a generalization of incorporating younger people into the account and removing me from the account, people that had not been on the account but were being transitioned into it without any real knowledge of the account because they were given that territory. They were younger, and I was being moved out of that area and into a different generation of clients to work with." Plaintiff conceded that only "some" of the west coast clients were younger than the clients in the south. Ms. Eisengruber, who was given the west coast area, was younger than Plaintiff.

Plaintiff complains that her "client base was being diminished . . . [that she was] having the same clients but fewer of them" and that her "responsibility and [her] workload diminished to the point of being noticeable." Plaintiff further complained that during this realignment period, Defendant Thuge "would contact [her] clients personally, without letting [her] know . . . and [her] clients . . . would call her and want to know why he was calling them . . . and it was an embarrassment . . . ." (Id.) When asked to explain her dissatisfaction with the realignment of clients, Plaintiff stated:

> I was trying to understand what the big picture was, which was not being made clear to me, and we had been working very hard to maintain those clients and to develop them, and them to have not understood why they were being changed or taken away made it very difficult to understand what was happening. And to be told that you have a good relationship with this client, but you are being taken away from that client after you have worked for four years to develop that relationship, there was – as I said previously, there was a lot of chaos and confusion, so the choice of saying yes, I want this territory versus that territory, I did not have that choice, and I did not say I would prefer this territory to that territory. That was not an option for me to say, and it was so confusing because you would be given a territory in this new transition, then someone would leave, and then the next thing you would know is you were being – said okay, now you are going to take that one back because there's nobody else to work it. So there was no set decision going on. It was a very confusing time, and everyone was just reacting to what job had to be done, so you did the job you had to do and took care of the clients

>     that were – needed to be serviced.

After this explanation, Plaintiff was asked how the client realignment appeared related to her age and Plaintiff responded it was "[t]he fact that I was not suited to the west coast." Plaintiff later agreed that she was not told she was not suited for the west coast; rather, she was "told [her] personality fits the south." Plaintiff surmised that Defendant "Thuge felt that [she] would do better with developing relationships with people that were more [her] age" and that, although Defendant Thuge never said anything about age, Defendant Thuge "led [her] to believe that" by "his actions." Plaintiff explained that the "actions" were that Defendant Thuge "took [her] away from developing relationships with people that were younger than I was, especially Microsoft." Plaintiff's particular grievance with the handling of the Microsoft account was described by Plaintiff as follows:

>     When we won the Microsoft account, I was immediately taken away
>     from a relationship with the Microsoft contact, Peggy Smith, who
>     was considerably younger than I am, and that was when we were at
>     a conference, and I was immediately separated from her and Caron
>     Eisengruber was introduced to her, and it was very confusing to
>     Peggy as to why, all of a sudden, she was being introduced to
>     someone else into that relationship and I was being shoveled off to
>     the side and told to go talk to another client who was more my age,
>     Mickey Leong with Northrup Grumman.

Plaintiff later acknowledged that the Microsoft decision was made after the territory realignment was announced. Plaintiff recognized that introducing Ms. Eisengruber to the Microsoft contact person was part of the plan to make clients comfortable with the transition from one CRM to another. Plaintiff also clarified that Defendant Thuge did not tell her to speak with people her own age but that she interpreted the situation in that manner because Defendant Thuge asked her to stop speaking with the Microsoft contact and to begin speaking with another contact.

     Plaintiff believes that she should have been promoted to the CRM team lead position rather than Michael Bailey. Plaintiff states that she and Mr. Bailey were "equal candidates," i.e., were equally qualified for the position. Plaintiff contends that she was told that she was not promoted because Mr. Bailey got along with Defendant Thuge better than she did. Plaintiff also thought she was not promoted because of her age and weight since Mr. Bailey is younger than Plaintiff and is of "average, normal weight." Plaintiff was also unhappy when, after Mr. Bailey was promoted to manage the CRMs, she and the other CRMs were not invited to attend management meetings and "no longer had any information about what was happening or had any input into the meeting." Although Plaintiff was disappointed in the decision promoting Mr. Bailey to the supervisory position, Plaintiff thought Mr. Bailey treated her fairly.

     Plaintiff also applied for a promotion to telesales manager in July 2005 but

-5-

that position was given to Nina Arnez, who was in "her 20s." Although Plaintiff considered herself qualified for that position, Bob Sparrow, who interviewed her and made the decision, did not.

Plaintiff filed a complaint with Human Resources regarding Defendant Thuge's comment to Plaintiff while walking in an airport during a business trip to Halliburton in Texas that "if you were a horse, they would shoot you." Plaintiff believes this statement is related to both her age and weight because, as she stated, "I was moving slowly and not as spry and cannot get through an airport as quickly as a younger, less overweight person can."

Lori Wertman, human resources consultant for Defendant GMACM, investigated Plaintiff's complaint about Defendant Thuge. Defendant Thuge did not deny or confirm that he made the "horse" comment when speaking with Ms. Wertman. Plaintiff concedes that human resources did investigate the complaint she filed but she felt the investigation was inadequate.

Defendant Thuge told Ms. Wertman that he did try to match personalities of the CRMs to appropriate territories because "the northeast clients communicate quickly or sharp and to the point, and some customer relationship managers do not enjoy working with the northeast due to that fact [a]nd he stated that southern territory is not as abrasive or direct." Defendant Thuge also stated that Plaintiff was given the Southern territory because her "biggest client was in Texas . . . ."

Plaintiff also complains that she was upset at being "watched" and that Mr. Bailey made an offer to Plaintiff for her to be paid a "premium" to work a late shift, i.e., from 11 a.m. to 7 p.m., rather than the 8:30 a.m. to 8:30 p.m. hours Plaintiff was working. Plaintiff conceded that this offer was for more money to work less hours, she "accepted" that offer, but she continued to come in at 8:30 a.m. and work until 8:30 p.m. On the other hand, Plaintiff also complained that she was "very bored because [she] didn't have any responsibilities, to speak of . . . ." Plaintiff believes that her "client caseload went from 70 to 20."

In August 2005, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").

In January 2006, Plaintiff, then 61 years old, resigned from GMACM and accepted a position with GMAC Global Relocation Services ("GRS"). This division of GMAC provided "turnkey" services for the relocation of a client's transferred employees. Plaintiff's new position was a lateral move, but was described in oral argument as a higher-level position, because it was a consulting role involving analyzing relocation policies and bench-marking. Plaintiff contends that her new employment was tainted by conversations between Defendant Thuge and her supervisor at GMAC GRS, Jill Taylor. Plaintiff asserts that Ms. Taylor told her that Defendant Thuge stated that Plaintiff was known for having difficulty with management and that Plaintiff was known for office gossip. These two comments are the only comments that Plaintiff attributes to conversations between Defendant Thuge and Ms. Taylor.

At a meeting on January 16, 2006, Ms. Taylor told Plaintiff that her skill level with respect to Microsoft Word, Excel, and Powerpoint was not meeting the

expectations of her position and that Plaintiff needed to pay more attention to details. Plaintiff felt as if she "could never meet [Ms. Taylor's] expectations." Plaintiff met with Ms. Taylor and Julie DeCero to discuss how her performance could be improved and Plaintiff was placed on a performance plan. Thereafter, Plaintiff's draft of an article was unsatisfactory to Ms. Taylor, so Ms. Taylor assigned another person to complete the task. On May 3, 2006, Plaintiff's employment with GMAC GRS was terminated.

After receiving a "right to sue" letter from the EEOC, the instant suit was filed. Plaintiff's allegations in the Second Amended Complaint are as follows: (I) violation of the Age Discrimination in Employment Act, including hostile work environment based on age; (II) violation of the Michigan Elliot-Larsen Civil Rights Act based on age, including hostile work environment based on age; (III) violation of ELCRA based on weight, including hostile work environment based on weight; (IV) unlawful retaliation for engaging in protected activity under the ADEA; (V) unlawful retaliation for engaging in protected activity under ELCRA; and (VI) defamation.

Plaintiff's retaliation claim against GMACM is based on the fact that she felt shunned by the management team (Defendant Thuge and Mr. Bailey), that her clients were immediately transitioned away from her, and that she feared for her job constantly. Her retaliation claim against GMAC GRS is based on the alleged statements made by Defendant Thuge to her supervisor at GMAC GRS that Plaintiff had difficulties with management and that she was involved in office gossip.

Plaintiff's weight discrimination claim is based on Defendant Thuge's comment, "do you really need that?," when Plaintiff approached a co-worker's candy jar, comments that it was important to exercise and watch what you eat, and comments that something she was wearing didn't match, all of which led Plaintiff to be "self-conscious around him about [her] appearance." Plaintiff clarified that her claims are based solely on the actions of Defendant Thuge; she does not contend that any other person treated her differently based on her age or weight.

Plaintiff summarizes: "my feeling was that I was being put in a place because of my age and moved into an area that had a more age reflective or age appropriate people with looking at the Halliburton people versus the younger people at The Gap, at Microsoft, and because of my age, I was being transitioned out of that area, in my personal opinion." Plaintiff based her feeling that the reassignments were because of her age on the sole fact that Ms. Eisengruber, who was younger than she was, was assigned the west coast. Plaintiff acknowledges that the realignment did not affect her salary, i.e., her salary stayed the same. Plaintiff further acknowledged that by September 2005, "Microsoft was back and it was my client again" and Microsoft was the only west coast client that had formerly been managed by Plaintiff that was reassigned to another CRM during the realignment.

Dkt. # 55 at 2-11 (citations to the record omitted).

II

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  A court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact.  *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).  The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts.  *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson,* 477 U.S. at 252. "[T]he party opposing the summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts."  *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v.*

*Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quotations omitted)).

III

The report and recommendation concluded that Defendants are entitled to summary judgment with respect to each claim. First, the magistrate judge found that Plaintiff was unable to establish a prima facie claim of discrimination against GMACM or that the non-discriminatory justifications for their decision were pretext for discrimination. Next, the magistrate judge concluded that Plaintiff has not advanced factual support for her allegation that her discharge was on the basis of discriminatory animus as opposed to her inability to perform the material duties of her position. Third, Judge Binder reasoned that Plaintiff had not established viable retaliation claims because the record does not support a finding of an adverse employment action or causal link between an alleged adverse employment action and the protected activity. Fourth, the magistrate judge reasoned that Plaintiff's hostile work environment claims should be dismissed because the record did not support the finding that Defendant Thuge's behavior created an objectively offensive work environment. Finally, Judge Binder recommended dismissal of the defamation claim because the statements are not actionable as opinions and protected as a former employer divulging information to a prospective employer. Plaintiff objects to each conclusion.

A

Discrimination cases under the ADEA follow the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). Likewise, the burden-shifting analysis under *McDonnell Douglas* applies equally to a parallel cause of action under ELCRA. *Cf. In re Rodriquez*, 487 F.3d 1001, 1007 (6th Cir. 2007).

-9-

With respect to each of these claims, the first step is to evaluate whether the plaintiff is able to demonstrate a prima facie claim.

Plaintiff advances three distinct theories of discrimination. First, Defendant GMACM discriminated against Plaintiff when it realigned Plaintiff's sales territory. Second, Defendant GMACM's decisions not to promote Plaintiff constituted discrimination. Third, Defendant GMAC GRS terminated Plaintiff on the basis of her age and weight. Judge Binder concluded that Plaintiff had not established a prima facie claim under these any of these theories and, in the alternative, Plaintiff was unable to meet her burden of demonstrating pretext.

i

First, with respect to Plaintiff's theory that reassignment of clients was discriminatory conduct, a prima facie discrimination claim under the ADEA and ELCRA require Plaintiff, inter alia, to demonstrate a triable issue of fact that she suffered an adverse employment action. The magistrate judge concluded realignment of clients did not constitute an adverse employment action. Recognizing that an adverse employment action is a "materially adverse change in the terms and conditions of [Plaintiff's] employment," *see* dkt. # 55 at 15 (quoting *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), Judge Binder reasoned that realignment of customer accounts was a de minimis alteration to Plaintiff's employment. *Id.* at 15-19.

Plaintiff's objection contends that the realignment was "a significant change in employment status" because it conferred upon her "significantly different responsibilities." Dkt. # 56 at 3 (quoting *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007)). While the objection highlights facts supporting discriminatory intent and effect, the most compelling fact supporting Plaintiff's view is that the realignment reduced her client base from seventy to twenty. *Id.* at 4. In addition, the

objection disagrees with the magistrate judge's application of *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535 (6th Cir. 2002).

As Judge Binder noted, the *Policastro* court acknowledged that "[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Id.* at 539 (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir.1996)). Moreover, "an employee's subjective impressions as to the desirability of one position over another are not relevant." *Id.* The fact that the employee in *Policastro* had her sales region reduced from two metropolitan areas to only one was insufficient to demonstrate an adverse employment action. *Id.*

Here, Plaintiff's realignment is slightly different because she was transferred to a different sales region altogether. Notwithstanding that fact, Plaintiff has not identified any detrimental effects of the realignment, such as reduced salary or loss of other employment benefit. Thus, the Court agrees that Plaintiff is unable to advance prima facie discrimination claims predicated on the realignment of clients.

ii

Next, Plaintiff also alleged Defendant GMACM did not promote her for discriminatory reasons. Under a failure to promote theory, a prima facie claim consists of the following elements: "(1) [the plaintiff] is a member of a protected class; (2) [the plaintiff] applied for and was qualified for a promotion, (3) [the plaintiff] was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). While the magistrate judge concluded that Plaintiff

had not put forth a prima facie claim under this theory, the Court disagrees. The record demonstrates that Plaintiff has met her burden with respect to each of these elements. The magistrate judge's reasoning, however, is applicable to the pretext analysis under *McDonnell Douglas* and will be more thoroughly considered below in section III(B)(i).

iii

The final allegation of discrimination centers on Plaintiff's discharge from Defendant GMAC GRS. Again, Plaintiff contends that she established a prima facie claim under this theory because she has advanced facts that she was qualified for the position – the only disputed element of the prima facie claim. Plaintiff's supervisor at Defendant GMAC GRS, Ms. Taylor, informed Plaintiff that her computer skills were deficient and that Plaintiff was not meeting Ms. Taylor's expectations. Plaintiff highlights one portion of the record that disputes this contention.[1] Plaintiff's former supervisor indicated that Plaintiff was "good at her [former] job," which required the use of Microsoft Word, Excel, and Powerpoint. Dkt. # 51-7 at 29. This testimony is enough to rebut Defendant GMAC GRS's assertion that Plaintiff was unqualified for her position and to establish a prima facie claim.

B

Once a plaintiff establishes a prima facie claim of discrimination, then the defendant may respond by offering a legitimate, non-discriminatory reason for its employment action. *Grosjean*, 349 F.3d at 335 (citation omitted). A plaintiff may rebut the non-discriminatory reason by demonstrating it is pretext for discrimination because the reason has no basis in fact, did not actually

---

[1] The objection also points to a 2005 annual performance review, however, that appears to document her performance while employed by Defendant GMACM. It appears that Plaintiff did not begin her employment for Defendant GMAC GRS until 2006.

motivate the employer's action, or was insufficient to motivate the action. *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) (citations omitted).

i

Defendant GMACM shifted the burden to Plaintiff by arguing that it did not promote Plaintiff because she was either unqualified or lesser qualified than other applicants. Likewise, Defendant GMAC GRS asserts that Plaintiff was unqualified for the position. Portions of the record support these views.

The objection disputes these justifications, asserting that neither is grounded in fact or actually motivated the decision. Notwithstanding Plaintiff's position, the objection does not develop either argument with respect to the failure to promote or discharge claims. Rather, Plaintiff focuses on reasons why the realignment of territories was pretext for discrimination. *See* dkt. # 56 at 5-7.

While Plaintiff contends that she was qualified for the telesales manager position and Defendant's justification is not grounded in fact, she has not carried her burden. The objection merely asserts she was qualified for the position. "In order to prove discrimination, though, the plaintiff[] must directly confront the asserted justification for the discharge." *Rowan v. Lockhead Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)). Plaintiff's mere assertion falls short of her burden.

With respect to the director of client relations position, Plaintiff acknowledges that she was equally as qualified as the employee that ultimately received the position. As the report and recommendation noted, an employer may choose between two qualified employees. Dkt. # 55 at 24 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981) (reasoning an "employer has discretion to choose among equally qualified candidates, provided the decision is not

based upon unlawful criteria" under Title VII); *cf. Rowan v. Lockhead Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (in context of ADEA, Plaintiff must rebut employer's justification that other employee was more qualified). "[E]vidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006). Again, Plaintiff has not carried her burden.

The report and recommendation emphasized that Plaintiff only speculated that Defendant Thuge influenced the promotions. Dkt. # 55 at 24-25. *Id.* A review of Plaintiff's response brief to the motion for summary judgment reveals that her strongest argument is that Defendant Thuge supervised the decisionmaker in charge of the promotions. While that may be true, the Court agrees that Plaintiff has only speculated that Defendant Thuge influenced the hiring decisions and Plaintiff has not carried her burden in demonstrating legitimate factual support for her assertion that the promotion decisions were pretext for discrimination.

ii

Likewise, Plaintiff's objection does not persuade the Court that Defendant GMAC GRS's termination of her employment was pretext for discrimination. Again, the burden shifts to Plaintiff to "directly confront the asserted justification for the discharge." *Rowan*, 360 F.3d at 550. While Plaintiff believed that her computer skills were sufficient, she acknowledged that she fell short of her supervisor's expectations. Dkt. # 51-7 at 42. Plaintiff also acknowledges that her supervisors spoke with her on other occasions regarding other performance deficiencies. *Id.* at 44. Beyond her personal view that she was satisfying her employment duties, Plaintiff has not provided any evidence

that demonstrates that she satisfactorily performed her position for Defendant GMAC GRS. Ultimately, Defendants GMACM and GMAC GRS are entitled to summary judgment with respect to the ADEA and ELCRA discrimination claims for the reasons discussed above.

C

Next, the magistrate judge concluded that Plaintiff was unable to establish a prima facie claim for retaliation under the ADEA or ELCRA. The burden rests with Plaintiff to demonstrate that (1) she engaged in a protected activity; (2) Defendant knew that she exercised her civil rights; (3) Defendant took adverse employment action against Plaintiff; and (4) a causal connection between the protected activity and the adverse employment action. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (citation omitted).

The Court agrees that Plaintiff is unable to demonstrate a prima facie retaliation claim. With respect to her claim asserted against Defendants GMACM and Thuge, Plaintiff can not identify an adverse employment action. As discussed above, the realignment of clients does not constitute adverse employment action.

With respect to the retaliation claim asserted against Defendant GMAC GRS, the objection contends that "regular communicat[ions]" between Thuge and Taylor raise a factual dispute whether Defendant GMAC GRS knew that she had filed complaints with Defendant GMACM and the EEOC. Notwithstanding this argument, Plaintiff has not identified any evidence that her complaints were revealed to Defendant GMAC GRS. Moreover, she has not provided evidence supporting a causal connection. To the contrary, Plaintiff's testimony indicates that Thuge and Taylor spoke prior to Defendant GMAC GRS hired Plaintiff. Thus, Plaintiff has not developed a causal connection because Defendant GMAC GRS would have known about her complaints prior to her

hire.  Defendants are entitled to summary judgment with respect to her retaliation claims.

D

Plaintiff also asserts claims for hostile work environment.  A prima facie case of a hostile work environment requires a plaintiff to demonstrate that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment unreasonably interfered with the plaintiff's work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective action.  *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008).  The magistrate judge concluded that Plaintiff had not demonstrated that Defendant Thuge's conduct, though inappropriate, was objectively offensive.  Dkt. # 55 at 30 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  While Plaintiff's objection emphasizes the extreme nature of Defendant Thuge's behavior, the Court is persuaded by the magistrate judge's thorough interpretation of the record.  *See* dkt. # 55 at 30-38.  The frequency and intensity of Defendant Thuge's comments do not reach a level of objective offensiveness.  *See*, *e.g.*, *Faragher*, 524 U.S. at 788. Again, Defendants are entitled to summary judgment.

E

Finally, the magistrate judge recommended dismissing the defamation claim because Defendant Thuge's comments are not actionable as privileged communications between a former and a prospective employer.  Indeed, an employer's opinions of a former employee's performance may be defamatory if it causes harm in the employee's business.  Dkt. # 56 at 12 (citing *Croton v. Gillis*, 304 N.W.2d 820, 822-23 (Mich. Ct. App. 1981)).  Plaintiff complains that Defendant Thuge

defamed her to Taylor. The only evidence of defamatory comments communicated from Defendant Thuge to Defendant GMAC GRS is Plaintiff's testimony that Taylor informed Plaintiff that Thuge had warned Taylor of Plaintiff's attitude towards her supervisors and being an office gossip. Dkt. # 51-7 at 41. While Taylor informed Plaintiff of this conversation after she began employment with Defendant GMAC GRS, it is clear that Defendant Thuge and Taylor had this conversation while Taylor considered employing Plaintiff. *See id.* ("[Taylor] told me that I was on notice; that she had had discussions with [Defendant Thuge] and had thought about not hiring me and not giving me the offer . . .").

As the magistrate judge reasoned, a former employer retains a qualified privilege to share information with a prospective employer regarding a former employee. *Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297 (Mich. 1991) (citation omitted). Plaintiff has not demonstrated that Defendant Thuge acted with actual malice, thus, the statements are protected by the qualified privilege. Indeed, the record indicates that Defendant GMAC GRS hired Plaintiff despite Defendant Thuge's comments about Plaintiff. Consequently, Defendants are entitled to summary judgment with respect to the defamation claim.

IV

Accordingly, it is **ORDERED** that the report and recommendation [Dkt. # 55] is **ADOPTED**. Plaintiff's objection [Dkt. # 56] is **OVERRULED**.

It is further **ORDERED** that Defendants' motion for summary judgment [Dkt. # 47] is **GRANTED**. Plaintiff's complaint [Dkt. # 24] is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: April 22, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 22, 2009.

s/Tracy A. Jacobs  
TRACY A. JACOBS

---